# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**CHAMBERS OF**
**SUSAN K. GAUVEY**
**U.S. MAGISTRATE JUDGE**

**101 WEST LOMBARD STREET**
**BALTIMORE, MARYLAND 21201**
**MDD_skgchambers@mdd.uscourts.gov**
**(410) 962-4953**
**(410) 962-2985 - Fax**

September 1, 2006

Frederick A. Raab, Esq.
Mignini and Raab LLC
606 Baltimore Ave., Suite 206
Baltimore, MD 21221

Charlene Bellinger Honig, Esq.
Office of the United States Attorney
36 S Charles St Fourth Fl
Baltimore, MD 21201

>        Re:  Joseph Aughinbaugh v. JoAnne B. Barnhart, Commissioner
>             of Social Security, Civil No. SKG-05-2438

Dear Counsel:

Plaintiff Joseph Aughinbaugh filed this action seeking review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying his application for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") benefits.  He has exhausted his administrative remedies.  Currently pending before the Court are cross-motions for summary judgment.  (Paper Nos. 11 & 14).  No hearing is necessary.  Local Rule 105.6.

For the reasons stated below, the Court DENIES defendant's motion and GRANTS plaintiff's motion to remand the case to the Commissioner for further proceedings consistent with this Memorandum.

1. **BACKGROUND**

Plaintiff filed an application for disability benefits on

-1-

June 2, 1998.  The application was denied by the Administrative Law Judge ("ALJ") on March 22, 2000.

In November 2001, plaintiff filed a second application for DIB and SSI on November 26, 2001 due to anxiety disorder[1], borderline intellectual functioning, somatoform disorder[2], leg pain, asthma[3] and hepatitis C.[4]  (R. 18, 70-72).  While the plaintiff originally set his onset date of February 1, 1997, at the hearing, the plaintiff amended the onset date to February 1, 1993.  (R. 18-19, 378).  Both applications were denied on April 18, 2002.  (R. 49-51).  The plaintiff's application for reconsideration was denied on December 13, 2002.  (R. 45).  On April 1, 2003, the ALJ dismissed plaintiff's case because he failed to file a hearing request in a timely fashion.  (R. 48). On May 10, 2003, the Appeals Council reversed the dismissal and remanded the case back to the ALJ for further proceedings. (R. 57-9).  On November 12, 2003, a hearing was held in front of the ALJ.  (R. 362-99).  The ALJ found the plaintiff was not disabled and therefore was not entitled to SSI or DIB benefits.  (R. 27-8).  On June 3, 2005, the Appeals Council denied plaintiff's request to review the decision. (R. 9-11).

At the time of the ALJ hearing, the plaintiff was 46 years old.  (R. 368).  He attended school through the eighth grade. (R. 370), and worked as a commercial truck driver until 1993 (R. 373), when he was injured at work. (R. 376).

In 1993, plaintiff suffered a leg laceration injury at work. (R. 20).  By 1997, plaintiff was suffering from panic attacks,

---

[1] Group of mental disorders in which anxiety and avoidance behavior predominate. Dorland's Illustrated Medical Dictionary ("Dorland's") at 547 (30th ed. 2003).

[2] Disorder where physical symptoms cannot be attributed to organic disease and appear to be of psychic origin. It is almost always associated with agoraphobia or intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult. Dorland's at 40, 1722.

[3] Recurrent attacks of paroxysmal dyspnea, with airway inflammation and wheezing due to spasmodic contraction of the bronchi. Dorland's at 168.

[4] A viral disease caused by the hepatitis C virus, the most common form of post-transfusion hepatitis; it also follows parenteral drug abuse and is a common acute sporadic hepatitis.  Chronic infection is generally mild and asymptomatic, but cirrhosis may occur. Dorland's at 837.

and had been diagnosed with borderline mental function, panic disorder with agoraphobia, moderate; alcohol dependence, early full remission; and an infected toe. (R. 270-2).[5]

A.   Medical Evidence

1. Johns Hopkins Bayview Medical Center

Plaintiff was hospitalized at Johns Hopkins Bayview Medical Center ("JHU Bayview") for panic attacks, shortness of breath, headaches and night sweats on February 9, 2000. (R. 141-161). After examination, plaintiff was prescribed Zyprexa[6] and referred to Dr. Debbie Weaver, MD of the JHU Bayview.  (R. 153). Beginning in February 200, Dr. Weaver saw plaintiff approximately once every three months for medication management.  (R. 201). Plaintiff also was treated by other members of the JHU Bayview staff, including Brenda Heideman, MSW, who saw plaintiff individually once a week.  When Ms. Heideman left JHU Bayview, plaintiff began to receive treatment from her former supervisor, L. Mernaugh, LCSW-C two times a month.  (R. 383).

On February 23, 2000, plaintiff visited Dr. Weaver concerning his medication for severe anxiety and hypochondrial concerns.  Dr. Weaver prescribed Zyprexa 5 mg and Paxil[7] 10mg.

---

[5] Because plaintiff's first application for social security was denied, res judicata bars the court from considering evidence submitted in the first proceeding. See Robbins v. Secretary of Health and Human Services, 895 F.2d 1223, 1224 (8th Cir. 1990)( "Reliance on evidence from a prior final proceeding defeats the policy of finality inherent in 42 U.S.C. § 405(h). The only exception to this ruling would be where the prior medical evidence would serve as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding."); Bladow v. Apfel, 205 F.3d 356, 361 n. 7 (8th Cir. 2000); Groves v. Apfel, 148 F.3d 809 (7th Cir. 1998) (Evidence submitted in support of the previous application is admissible to "reinforce or illuminate or fill gaps in the evidence developed for the second proceeding."); Albright v. Commission of Social Security Administration, 174 F.3d 473 (4th Cir. 1999).  As a result, the ALJ appropriately only reviewed plaintiff's medical records from prior to 2000 "for clarity". (R. 20).

[6] A monoamingergic agent used as an anti-psychotic.  Also referred to as olanzapine.  Dorland's at 1304.

[7] A selective serotonin reuptake inhibitor, used to treat depressive, panic, and social anxiety disorders.  Also referred to as paroxetine hydrochloride. Dorland's at 1372.

(R. 175).  Dr. Weaver also prescribed Benadryl[8] 25mg for plaintiff's asthma concerns.  (Id.)

By March 22, 2000, Dr. Weaver noted that plaintiff looked like different person, and that plaintiff had not had any fully blown panic attacks, although he still had hypochondrial[9] fears. (R. 179).  Dr. Weaver increased his Zyprexa dosage to 10 mg, because plaintiff continued to fixate on his belief that he is ill.  (R. 180).

On June 7, 2000, Dr. Weaver noted plaintiff was alert, although somewhat intellectually limited, calm and cooperative. She stated plaintiff was no longer depressed and has energy at 90%), but he still gets panic attacks 2-7 times a week.  (R. 181).  Dr. Weaver stated that plaintiff was negative to idea of vocational rehabilitation, but agreed that working again is important for full recovery.  (R. 182).  Dr. Weaver also noted that plaintiff does have mild asthma, but "unfortunately (since he is so black and white in his thinking, his diagnosis of mild asthma makes it hard for us to reassure him absolutely that he is not medically disabled."  (R. 182).  His prescription to Paxil was increased to 30 mg.  (R. 181).

Plaintiff's treatment continued between September 2000 and October 2001.  Dr. Weaver noted that with medication plaintiff was no longer depressed, was alert, stopped having full blown panic attacks, and only had mild to partial panic attacks between zero to three times a week.  (R. 183, 186, 189, 191, 192, 195, 197).  Moreover, Dr. Weaver recorded that plaintiff stopped having full blown asthma attacks.  (R. 184, 192).  However, Dr. Weaver noted that while plaintiff's symptoms were minimal, because plaintiff was reluctant to leave the sick role, he remained somatically focused especially when feeling pressured to attend vocational training.   (R. 184, 186, 189, 191, 192, 195, 197).

On October 4, 2001, plaintiff saw Brenda Heideman.  (R. 199-201).  Ms. Heideman stated that plaintiff reported not having any

---

[8] The hydrochloride salt of a potent antihistamine and anticholinergic, used for the symptomatic treatment of allergic symptoms. Also referred to as diphenhydramine hydrochloride. Dorland's at 522.

[9] A somatoform disorder characterized by a preoccupation with bodily functions and the interpretation of normal sensations or minor abnormalities as indications of serious problems needing medical attention. Dorland's at 893.

full blown panic attacks, but still struggles with fear that they may return when he starts to do more things.  (R. 199).

On January 31, 2002, Dr. Weaver reported that plaintiff tested positive for Hepatitis C, which "triggered massive hypochondriacal concerns and more from attachment to sick role." (R. 203).  Dr. Weaver stated that the finding could be incidental because positive test could have resulted from increased antibodies from his infection with acute Hepatitis NonA/non B at age 13, since he has been asymptomatic.  She also noted that plaintiff had not attended Crossroads, although his sick patient role can only be treated by him shifting from a sick to a functional role.  (Id.)

On March 26, 2002, Dr. Weaver completed a DSS/SSA Medical Report for the plaintiff.  (R. 204-208).  In the report, Dr. Weaver indicated that plaintiff has not reported any panic attacks "but has become quite somatically focused, especially when he is feeling pressured to move out of the 'sick role' or is encouraged to participate in more activities to improve his overall functioning."  (R. 205).  When asked to list how plaintiff's functioning was impaired, Dr. Weaver noted that "he limits his activity level because of hypochondrial concerns that 'doing too much' will cause severe illness."  (R. 207).

By April 2002, plaintiff's GAF had increased to 65[10].  (R. 209-12).  Ms. Heideman noted that plaintiff's overall functioning had improved greatly as he participates in the Crossroads program 3 times a week for 4-6 hours a day. (Id.)

On April 26, 2002, plaintiff went to the hospital for knee pain after he felt his knee "pop".  (R. 168).  Dr. Raymond Hsu, MD, determined from plaintiff's x-rays, that no radiographic[11] evidence existed of fracture, dislocation or effusion[12], with

---

[10] The GAF score is used "for reporting the clinician's judgment of the individual's overall leave of functioning."  DSM-IV at 32-4.  A GAF score of between 31-40 indicates some impairment in reality testing or communication or major impairment of several areas, such as work or school, family relations, judgement, thinking or mood.  Id.

[11] Evidence made by film records of internal structures of the body by passage of x-rays or gamma rays through the body to act on specially sensitized film. Dorland's at 1563.

[12] The escape of fluid into a part of tissue. Dorland's at 591.

minimal calcification[13] at insertion of quadriceps tendon.  (R.
171).  Upon examination, plaintiff's knee was found to be tender
at left medial joint, (R. 170) so he was treated with a knee
immobilizer[14].  (R. 169).

On May 31, 2002, Dr. Weaver noted that plaintiff was alert
and pleasant, with no severe panic attacks, but still very
somatically focused in a hypochondriacal way. (R. 213).  She
sensed some conscious awareness "by the plaintiff of the
potential gain he gets from sick role; He seems to have further
stepped back into sick role focusing on finding that he has
Hepatitis C." (R. 213).  She noted that plaintiff attended
Crossroads until he had a falling out with the therapist. (Id.)
"Although [I] cannot force him to do anything I do believe the
vocational component of his refusing to engage in voc rehab as
something that will affect decision about his disability and I
will be candid on paperwork about it." (R. 214).

On November 11, 2003, L. Mernaugh, LCSW-C and one of
plaintiff's therapists, completed a psychiatric review technique
form, whereby she stated that plaintiff had disorders which met
the following listings of impairments: Listing 12.06, 12.07,
12.08, and 12.09. (R. 238-46).  In so determining, L. Mernaugh
stated that plaintiff had marked restrictions of activities of
daily living, extreme difficulties in maintaining social
functions, continual episodes of decompensation, and constant
deficiencies of concentration, persistence or pace. (R. 242).
In addition, she indicated that plaintiff has persistent
irrational fear of a specific object, activity or situation which
results in a compelling desire to avoid the dreaded object,
activity or situation, recurrent severe panic attacks manifested
by a sudden unpredictable onset of intense apprehension,
recurrent obsessions or compulsions which are a source of marked
distress. (R. 239).

### 2. Dr. Jerome Rubin, Ph.D.

Dr. Jerome Rubin, licensed clinical psychologist, conducted
a psychological evaluation of plaintiff on May 10, 2002 in
connection with his application for social security disability.
(R. 172-4).  Dr. Rubin found plaintiff was mentally alert and
well oriented in all spheres, and within normal limits for

---

[13] The process by which organic tissue becomes hardened by a
deposit of calcium salts within its substance. Dorland's at 271.

[14] An object that immobilizes the knee.  Dorland's at 909.

intelligence, memory, vocabulary, comprehension, reasoning and judgment. (R. 172). In addition, he found that there was no presence of abnormal anger or suspicions and no problems of reality contact. (<u>Id.</u>) He concluded that plaintiff did not appear to be depressed, but had significant signs and complaints of high anxiety and associated symptoms. (<u>Id.</u>) Dr. Rubin found that plaintiff had a GAF of 55, and diagnosed the plaintiff with chronic pain disorder[15] associated with psychological factors and general medical condition, and generalized anxiety disorder with panic attacks.[16] (R. 174).

Dr. Rubin completed a psychiatric review technique form concerning the plaintiff on July 7, 2003. (R. 227-37). Dr. Rubin found plaintiff had poor to no ability to follow work rules, relate to co-workers, deal with the public, use judgment in public, interact with supervisors, deal with work stresses function independently, and maintain attention/concentration, because he is diagnosed with chronic pain disorder due to his work-related physical injuries causing mental distractions and low tolerance for meeting work rules and dealing with people. (R. 236). In addition, Dr. Rubin found plaintiff had poor to no ability to understand and carry out complex job instructions and detailed, but not complex, job instructions, because "plaintiff is very focused inward, is unstable, has anger moods, high anxiety and multiple somatic complaints that adversely affect his ability for work performance." (R. 235). He also concluded that plaintiff has poor to no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability, because mental disturbances "causes plaintiff to have poor ability to attend to norms of social behavior or to be reliable or emotionally stable in interpersonal relationships." (R. 235). He concluded that plaintiff "cannot do work performance at normal standards due to inattention, physical limitations, headaches, visual disturbances, nausea, dizziness, and loss of mood control" (R. 237). Moreover, he found plaintiff had marked restrictions of activities of daily living, extreme difficulties in maintaining social functions, and frequent limitations in concentration, persistence, or pace. (R. 233).

---

[15] A somatoform disorder characterized by a chief complaint of severe chronic pain that causes substantial distress or impairment in functioning; the pain is neither feigned nor intentionally produced, and psychological factors appear to play a major role in its onset, severity, exacerbation or maintenance. <u>Dorland's</u> at 550.

[16] A group of mental disorders in which anxiety and avoidance behavior predominate. <u>Dorland's</u> at 547.

            3.   <u>Highlandtown Community Health Center</u>

     On October 18, 2001, plaintiff tested positive for hepatitis
C.  (R. 126).  Dr. Vinson saw plaintiff on February 18, 2002 for
a follow-up examination.  (R. 130).  Record does not indicate any
additional medication, testing or treatment was prescribed for
the Hepatitis C at that time.

     B.   <u>Government Reviewers</u>

     On March 11, 2002, a medical summary record was completed,
whereby the government reviewer concluded that the plaintiff's
physical impairments, asthma and Hepatitis C were not severe.
(R. 119).

     On April 3, 2002, a medical summary record was completed by
a psychiatric consultant who diagnosed the plaintiff with a panic
disorder.  (R. 120).  On April 11, 2002, government reviewers
completed a psychiatric review technique form (R. 132-7) and a
mental residual capacity assessment.  (R. 138-140).  The
government reviewers concluded that plaintiff did not met the
criteria of Listing 12.06 or 12.07 of the Listing of Impairments,
because plaintiff only has mild difficulties in maintaining
social functioning, moderate restrictions of daily living,
moderate difficulties in maintaining concentration, persistence
or pace, and no repeated episodes of decompensation.  (R. 135).
The reviewers also concluded that plaintiff had moderate
limitations in ability to maintain attention and concentration
for extended periods, in ability to perform activities within a
schedule, maintain regular attendance, and be punctual with
customary tolerances, and in ability to complete a normal workday
and work week without interruptions from psychologically based
symptoms.  (R. 139).  As a result, the reviewers found plaintiff
was capable of performing unskilled work.  (R. 140).

     On September 3, 2002, a medical summary record was completed
by a medical consultant and psychological consultant. (R. 121).
The medical doctor concluded that plaintiff's impairments of
hepatitis C and asthma were not severe.  (R. 121).  The
psychological consultant also concluded that plaintiff's
impairments were not severe.  (<u>Id.</u>)

     On December 13, 2002, Dr. Kenneth Wessel completed a
psychiatric review technique form (R. 217-222) and a mental
residual capacity assessment.  (R. 223-5).  Dr. Wessel stated
that evidence appears credible and shows the presence of a severe
mental impairment under Listing 12.06 and 12.07 (R. 225).  He
concluded that plaintiff's impairments did not meet either

                              -8-

Listing 12.06 or 12.07, because plaintiff had only mild difficulties in maintaining social functioning, moderate restrictions of daily living, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (R. 221). Dr. Wessel also found that plaintiff functioned in a generally independent fashion, and is capable of completing daily living functions within the constraints of the mental conditions. Moreover, Dr. Wessel concluded that plaintiff can relate with others and is capable of negotiating in the community. (Id.) Dr. Wessel noted that plaintiff was moderately limited in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, maintain and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and ability to respond appropriately to work place changes. (R. 223-5). As a result, Dr. Wessel found plaintiff is capable of work related functions equated with competitive employment. (R. 225).

2.   **STANDARD OF REVIEW**

The primary function of this Court on review of Social Security disability determinations is not to try plaintiff's claim de novo, but rather to leave the findings of fact to the agency and to determine upon the whole record whether the agency's decision is supported by substantial evidence. King v. Califano, 599 F.2d 597 (4th Cir. 1979); Teague v. Califano, 560 F.2d 615 (4th Cir. 1977). Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and must be sufficient to justify a refusal to direct a verdict was the case before a jury. Teague v. Califano, 560 F.2d at 618; Johnson v. Califano, 434 F.Supp. 302 (D.Md. 1977).

However, the inquiry does not end there. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law," Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The deferential standard of review applied to the agency's findings of fact does not apply to conclusions of law or the application of legal standards or procedural rules by the agency. Wiggins v. Schweiker, 679 F.2d 1387 (11th Cir. 1982).

Finally, it must be noted that hearings on applications for Social Security disability entitlement are not adversary proceedings. Easley v. Finch, 431 F.2d 1351 (4th Cir. 1970).

Moreover, the Social Security Act is a remedial statute and it is to be broadly construed and liberally applied in favor of beneficiaries. <u>Dorsey v. Bowen</u>, 828 F.2d 246 (4th Cir. 1987). A claimant is entitled to a full and fair hearing and failure to have such a hearing may constitute sufficient cause to remand the case. <u>Sims v. Harris</u>, 631 F.2d 26 (4th Cir. 1980).

3.  **ALJ's Findings**

In evaluating plaintiff's claim for disability, the ALJ followed the sequential five step process set forth in the Code of Federal Regulations, 20 C.F.R. §§ 404.1520, 416.920.

The first step of the process requires that the plaintiff show he has not been involved in substantial gainful activity for the period of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). Here, the ALJ found the plaintiff had not engaged in substantial gainful activity since the date he allegedly became disabled. (R. 27).

The second step requires the plaintiff to demonstrate that his impairment is "severe," as defined in sections 404.1421 and 416.921. 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ found the plaintiff suffered from the following severe impairments: anxiety disorder, borderline intellectual functioning, somatoform disorder, and a history of alcohol and substance abuse. (R. 23). However, the ALJ concluded that the following impairments were not severe: hepatitis C, leg pain, and asthma. (<u>Id.</u>)

At the third step, the plaintiff must establish that his severe impairments meet or equal the criteria of one of the impairments in the Listing of Impairment ("Listing") contained in 20 C.F.R. Part 404, subpart P, appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). The ALJ concluded that the plaintiff's severe impairments were not severe enough to meet or equal one of the listed impairments. (R. 23).

At the fourth step the plaintiff must show that because of his impairment, he does not retain the residual functioning capacity ("RFC") to perform his past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the ALJ found the plaintiff has the residual functioning capacity ("RFC") to perform the exertional and non-exertional requirements of low stress, 1-2 step task jobs, and that he therefore is unable to perform his past relevant work. (R. 28).

If the plaintiff's RFC prevents him from performing his past relevant work, or if he has no past relevant work, the

burden shifts to the Commissioner at the fifth step.  Pass v. Charter, 65 F.3d 1200, 1203 (4th Cir. 1995).  The Commissioner must show that, in light of the plaintiff's age, RFC and education, he can perform other work available in significant numbers in the local and national economies.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Here, the ALJ found the range of evidence supports a finding that the plaintiff can perform jobs that exist in significant numbers in the regional and national economy, including laundry worker (1,900 jobs in region; 390,000 jobs in nation); machine tender (350 jobs in region; 65,000 jobs in nation); cafeteria worker (2,000 jobs in region; 395,000 jobs in nation); and mail clerk (2,500 jobs in region; 45,000 jobs in nation). (R. 28).

4.   **DISCUSSION**

On appeal, plaintiff raises the following arguments.  At Step Three, plaintiff argues that the ALJ failed to appropriately analyze whether the plaintiff's impairments met a specific listing or whether the combination of plaintiff's impairments met or were the medical equivalent of a listing.  Moreover, plaintiff argues that the ALJ's findings at Step Three were not supported by substantial evidence, because he failed to fully consider the opinions of Dr. Rubin and L. Mernaugh, social worker.  At Step Five, plaintiff argues that the ALJ's finding that plaintiff could return to other work available in the local and national economy was not supported by substantial evidence, because he failed to appropriately consider the findings of Dr. Rubin and L. Mernaugh or consider the combined effects of plaintiff's severe and non-severe impairments.

A.   **Failure to Develop the Record**

The Court need not determine at this time whether substantial evidence exists to support the ALJ's opinion at either Step Three or Step Four, because, on review, significant gaps appear in the record.

An ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."  Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981); Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980)).   The duty arises "even if the claimant is represented."  Fleming v. Barnhart, 284 F.Supp.2d 256, 272 (D. Md. 2003)(emphasis in original).

If the evidence is "inadequate for the ALJ to determine whether [the claimant is] disabled", the ALJ must re-contact physicians, psychologists, or other medical sources.  20 C.F.R. § 404.1512(e); <u>France v. Apfel</u>, 87 F.Supp.2d 484, 489-90 (D. Md. 2000).

The record establishes that Dr. Weaver treated plaintiff between February 23, 2000 through May 31, 2002.  While Dr. Weaver diagnosed plaintiff with severe anxiety and hypochondriacal concerns, she never gave her opinion concerning plaintiff's ability to work.

Yet, without any evidence to support her conclusion, the ALJ <u>presumed</u> that because Dr. Weaver encouraged the plaintiff to participate in vocational rehabilitation, Dr. Weaver believed plaintiff was capable of work.  (R. 25) ("She has repeatedly encouraged the claimant to participate in vocational rehabilitation, presumably because she believed the claimant capable of working.")  The ALJ's presumption is not supported by substantial evidence.  Notably this presumption is in direct contradiction to the stated view of L. Mernaugh, another member of the Bayview interdisciplinary team treating the plaintiff. Because a narrow intersection exists between certain diagnoses of mental illness and willful failure to comply with medical treatment, it is very important in these cases for medical evidence to be evaluated precisely and without elaboration or speculation.  Moreover, as plaintiff correctly notes, vocational training is not equivalent to a full-time, regular job on a continuing basis.  As a result, by recommending plaintiff attend vocational training as part of her therapy, Dr. Weaver did not necessarily conclude that plaintiff was capable of working.

This failure to develop the record (and reliance on a presumed opinion, in the face of a contrary, express view) is material in this case because the ALJ relied on Dr. Weaver's opinion to support her conclusions at Step Three and Step Four. The ALJ stated that "Dr. Weaver's treatment notes and medical review assessments for the claimant appears to be the most accurate information available regarding the claimant's ability to work." (R. 24).

Moreover, the mere fact that the ALJ supported her opinion with presumptions suggests the need for additional record development.  On review, the Court finds that the other medical evidence in the record, in combination, would not be sufficient for the ALJ to determine whether plaintiff was disabled.  As discussed below, either the conclusions of the other medical sources were not sufficiently supported or the other sources did

not personally examine the plaintiff.

Dr. Weaver worked with Brenda Heideman, social worker and L. Mernaugh LSC-W as an interdisciplinary team, to treat plaintiff at JHU Bayview.  While two of Ms. Heideman's medical reports were included in the record, her assessment of plaintiff's ability to engage in work was not provided.  The other social worker, L. Mernaugh, LSC-W, did complete a psychiatric review treatment form in October 2003, where she concluded that plaintiff had marked restrictions of activities of daily living, extreme difficulties in maintaining social functions, continual episodes of decompensation, and constant deficiencies of concentration, persistence or pace.  (R. 242).  However, L. Mernaugh did not explain her conclusion, and none of L. Mernaugh's treatment notes or records were provided.  Moreover, all of the medical documentation from Dr. Weaver and Ms. Heideman in the file pre-date L. Mernaugh's psychiatric review treatment form by over a year.  Consequently, the ALJ did not have sufficient, current evidence to evaluate and reject L. Mernaugh's opinion.

Moreover, the ALJ did not consider L. Mernaugh as a treating source whose opinion is entitled to controlling or even significant weight.  It can be reasonably inferred from the treatment record that Mernaugh was a treating source whose opinion is entitled to controlling or at least significant weight.  Although L. Mernaugh is not a physician, as a social worker and member of plaintiff's treatment team at Johns Hopkins Bayview, she is an acceptable medical source under 20 C.F.R. §§ 416.913(a).  See Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (A social worker may qualify as an acceptable medical source if the social worker is associated with a physician, psychologist, or other acceptable medical source, and the social worker acts so closely under the supervision of the treating physician that the social worker's opinion should properly be considered part of the physician's opinion); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) (giving treating source status to group of medical professionals who used a team approach to treat the plaintiff); Stroup v. Apfel, 204 F.3d 1334, *4 n.2 (4th Cir. 2000) (unpublished) (finding social worker was appropriate medical source where social worker worked with psychiatrist to diagnose the plaintiff); Mathis by Mathis v. Shalala, 890 F.Supp. 461 (E.D.N.C. 1995) (testimony of social worker who worked on interdisciplinary team could be considered both as a treating source or as other source evidence under the regulations); Gomez v. Chater, 74 F.3d 967, 970-1 (9th Cir. 1996) (The social worker must act so "closely under the supervision" of the treating physician that the social worker's opinion should be "properly considered as part of the opinion" of the physician).  If the ALJ

-13-

had any question regarding the relationship between L. Mernaugh
and Dr. Weaver she should have made inquiries to satisfy herself
on this point, rather than simply dismiss the social worker
assessment as "other evidence" entitled to neither controlling or
significant weight.  (R. 24).  And, of course, given the
perceived conflict in opinions of two members of the treatment
team, the ALJ should have further explored the matter.

     Dr. Rubin concluded plaintiff had marked restrictions of
activities of daily living, extreme difficulties in maintaining
social functions, and frequent limitations in concentration,
persistence, or pace.  (R. 233).  However, the Court agrees with
the ALJ that Dr. Rubin's opinion is entitled to little weight.[17]
Dr. Rubin only examined plaintiff once.  <u>See</u> SSR 96-6p ("The
opinions of physicians or psychologists who do not have a
treatment relationship with the individual are weighed by
stricter standards, based to a greater degree on medical
evidence, qualifications, and explanations for the opinions, than
are required of treating sources").  Yet, his psychiatric review
technique ("PRT") and RFC analysis could be seen as contradictory
to his examination notes.  For example, while during the
examination Dr. Rubin noted that plaintiff had no presence of
abnormal anger or suspicions (R. 172), in his PRT, Dr. Rubin
stated that plaintiff had no to poor ability to carry out complex
job instructions because plaintiff has anger moods and high
anxiety, among other reasons.  (R. 235).  Moreover, while Dr.
Rubin stated in the PRT that plaintiff had marked and extreme
limitations (R. 233), at the examination, Dr. Rubin gave
plaintiff a GAF of 55.  (R. 174).  In addition, Dr. Rubin's
conclusions were inconsistent with the government reviewers and
were not otherwise supported by Dr. Weaver and Brenda Heideman.
Indeed, while Dr. Rubin concluded plaintiff cannot "do work
performance at normal standards due to inattention, physical
limitations, headaches, visual disturbances, nausea, dizziness,
and loss of mood control" (R. 237), no other medical evidence in
the record even suggests that plaintiff suffered from nausea,
dizziness, headaches, or visual disturbances, and Dr. Rubin
himself failed to explain the basis for his conclusion.

     Finally, the record contains RFC Assessments and psychiatric
review treatment forms from two government reviewers: an

_____

     [17] The ALJ gave Dr. Rubin's opinion little weight, because Dr.
Rubin gave the claimant a GAF rating of 55, which corresponds to
moderate limitations in social, occupational and school functioning,
and because Dr. Rubin health assessment was inconsistent with the
record and treatment notes of Dr. Weaver.  (R. 25).

assessment completed by Dr. Wessel on December 13, 2003 (R. 217-225) and assessment completed on April 3, 2002 by a government consultant. (R. 132-140).  Both reviewers concluded that plaintiff was capable of some work.  However, neither consultant actually examined the plaintiff.  <u>See</u> 20 C.F.R. § 404.1527 ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."); SSR 96-6p ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.  For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.").  Moreover, neither assessment is supported by other medical evidence in the record, insofar as no other medical source determined plaintiff was able to work.  <u>See</u> SSR 96-6p ("The opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight <u>only</u> insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence..., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.")  Finally, neither government examiner explained what evidence they relied on to determine plaintiff's limitations and ability to work.[18]  The Court is, of course, cognizant that the government reviewers are qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.  SSR 96-6p.  However, the reports of non-examining government consultants by themselves are not sufficient for the ALJ to determine plaintiff's disability, in the absence of other supporting medical evidence.

"The ALJ should <u>ordinarily</u> be entitled to rely on claimant's counsel to structure and present claimant's case in a way that

---

[18] Indeed, even though Dr. Wessel found plaintiff's allegations were credible, he concluded without explanation that plaintiff was capable of work related functions equated with competitive employment. (R. 225).

claimant's claims are adequately explored.  Thus, in a counseled case, the ALJ may <u>ordinarily</u> require counsel to identify the issue or issues requiring further development." (emphasis added) <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167 (10th Cir. 1997)(citing <u>Glass v. Shalala</u>, 43 F.3d 1392-6 (10th Cir. 1994).  At the same time, plaintiff should not be penalized by the lack of thoroughness of either his attorney or the ALJ, on key issues. Where the ALJ makes "presumptions," resulting in a radical difference of opinion among treatment team members, further development of the record is clearly necessary.[19]  This, then, is not the "ordinary" case and remand is appropriate.

On remand, the Court suggests that the ALJ should consider (1) sending plaintiff to a consultative examiner, (2) contacting Dr. Weaver to complete a specific mental assessment on ability to work, or (3) contact L. Mernaugh to provide her treatment records or other explanation of her opinion of plaintiff's inability to work due to his mental impairments.

## B.  **Step Three**

Plaintiff also argues that the ALJ erred at Step Three because he did not fully analyze whether the plaintiff's impairment met a specific listing, and did not determine whether the combined effect of plaintiff's impairments met or was medically equivalent to one of the Listings of Impairments.

The responsibility for determining medical equivalence lies with the Administrative Law Judge.  20 C.F.R. § 416.926; SSR 96-6p.  "Medical equivalence must be based on medical findings."  20 C.F.R. § 404.1526(b).  The ALJ will compare the symptoms, signs, and laboratory findings about the impairments as shown in the medical evidence with the medical criteria shown with the listed impairment.  20 C.F.R. § 404.1526(a).

The ALJ's Step Three analysis was adequate.  He found that plaintiff's severe impairments, anxiety disorder, borderline intellectual functioning, a somatoform disorder, and history of alcohol and substance abuse, are not severe enough to meet or medically equal one of the listings of impairments because "the claimant is not markedly limited in any broad based mental functioning area outlined in part 'b' of listings 12.05, 12.06,

---

[19] While further development of the record is necessary, the Court found the ALJ's analysis of the evidence in the record to be very thorough and exhaustive.

or 12.07."[20]   Consistent with the findings of government reviewer
Dr. Wessel and the treatment notes of Dr. Weaver, plaintiff has
moderate limitations in his activities of daily living, mild
limitations in social functioning, moderate limitations in his
ability to maintain concentration, persistence, or pace, and has
once or twice caused episodes of decompensation of an extended
duration. (R. 23-4).   Moreover, the ALJ concluded that plaintiff
"is not completely unable to leave the home without an
exacerbation of his symptoms", and his "intellectual functioning
level does not fall within the listing criteria noted in 12.05."
(R. 23).   Thus, the ALJ did discuss the criteria for the relevant
psychiatric listings.

However, the ALJ did not expressly consider whether the
combination of plaintiff's non-severe impairments (leg pain,
hepatitis C, and asthma) and severe impairments met or equaled a
listing of impairment.   <u>See</u> SSR 96-6p (the ALJ must review the
symptoms, signs and laboratory findings about the impairment "to
determine whether the combination of [plaintiff's] impairments
is medically equal to any listed impairment."); <u>Walker v. Bowen</u>,
889 F.2d 47, 50 (4th Cir. 1989)("Congress explicitly requires
that the combined effect of all the individual's impairments be
considered, 'without regard to whether any such impairment if
considered separately' would be sufficiently severe. Therefore, a
failure to establish disability under the listings by reference
to a single, separate impairment does not prevent a disability
award.")(internal citation omitted).

Defendant incorrectly argues that the ALJ's failure to do is
not error, because the <u>record</u> establishes that the state agency
consultants designated by the Commissioner had determined that
plaintiff's non-severe and severe impairments were not equivalent
to any listing of impairment. (R. 44, 251, 255).   The Social
Security Administrations's own regulations establish that while
the ALJ may consider the medical opinion given by one or more of
the medical or psychological consultants designated by the
Commission in deciding medical equivalence,  20 C.F.R. §
404.1526(b), "[t]he responsibility for determining medical

---

[20] To conclude that the plaintiff's impairments either met or were
the medical equivalent of either Listing of Impairment 12.05, 12.06,
or 12.07, the ALJ must find at least two of the following: marked
restrictions of activities of daily living, marked difficulties in
maintaining social functioning; marked difficulties in maintaining
concentration, persistence, or pace; or repeated episodes of
decompensation, each of an extended duration.  20 C.F.R. Pt. 404,
Subpt. P, App. 1.

equivalence lies with the Administrative Law Judge."  20 C.F.R. §
416.926; SSR 96-6p.  Moreover, the Court may not infer that the
ALJ undertook the review from the record at hand.  <u>See</u>
<u>Reichenbach v. Heckler</u>, 808 F.2d 309, 312 (4th Cir. 1985)(The ALJ
must explain his evaluation of the combined effects of the
impairment); <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir.
1989)(same); <u>Books v. Chater</u>, 91 F.3d 972, 980 (7th Cir.
1996)(The ALJ must sufficiently articulate his assessment of the
evidence to assure that he considered all relevant evidence so
that the Court can undertake an intelligent review of the
matter).

     Even if the Court agreed with defendant, the documents
relied on by the defendant do not establish that the combined
effect of the plaintiff's disorders were not the medical
equivalent of any impairments included in the listing.  Defendant
first relied on the Disability Determination and Transmittal
sheet.  (R. 44).  The report does not state that the combined
impairments are not the medical equivalent of a listing.  While
the report was signed by the state agency medical consultant, the
signature only establishes that the issue had been considered at
the initial and reconsideration levels of administrative review.
SSR 96-6p.  No explanation or basis was provided for the
conclusion, including what medical impairments were considered.
The defendant also relied upon the medical and psychological
reports compiled by the state agency consultants.  (R. 251, 255).
However, neither of the reports are persuasive authority.  While
both experts did conclude that the plaintiff's conditions were
not the medical equivalent of a listing impairment, the record
does not indicate that the either expert considered <u>both</u> the
plaintiff's mental and physical impairments.

     As a result, on remand the ALJ should consider whether
plaintiff's severe and non-severe impairments in combination met
or were the medical equivalent of the relevant psychiatric
listing.[21]

_____

     [21] The ALJ's failure to consider the combined effects of the
severe and non-severe impairments likely was harmless error, because
plaintiff failed to present evidence that his non-severe impairments,
leg pain, Hepatitis C and asthma had <u>any</u> effect on his physical or
mental functioning.
     Plaintiff tested positive for Hepatitis C on October 18, 2001,
but no evidence in the record suggests that the disease affected his
physical or mental health.  Indeed, Dr. Weaver noted that plaintiff
was asymptomatic in January 2002.  (R. 203).  Moreover, when
plaintiff was examined by Dr. Vinzon after testing positive for
Hepatitis C, the medical records submitted did not establish that Dr.

C.    **Step Five**

Similarly, at Step Five, plaintiff argues that the ALJ failed to consider the combined effect of his severe impairments and the impairments the ALJ found were not severe, including his Hepatitis C, back pain, and asthma.

The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process.    20 C.F.R. § 404.1523; Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir.1989).  The regulations provide that the ALJ "will consider the combined effect of all of [claimant's] impairments

---

Vinzon ordered any additional treatment for the disorder, including any medications, testing, or even further appointments. Although plaintiff at the ALJ hearing that he was ordered to undergo a series of shots for the Hepatitis C (R. 380), no medical records are contained in the file to substantiate this claim.

Similarly, while plaintiff has been diagnosed with mild asthma (R. 182), in June and October 2000, plaintiff reported that he no longer had any full-blown asthma attacks, (R. 183, 192).  No evidence in the record suggests that plaintiff's asthma re-appeared in the following years, or that it otherwise affected his physical or mental health. At the ALJ hearing, plaintiff testified that Dr. Vinson prescribed him an inhaler for his asthma.  (R. 383).  However, the medical documentation provided by the plaintiff does not support this claim.

Finally, even though plaintiff alleges that he suffers from leg pain, during the relevant time period, plaintiff only sought medical treatment for the pain on once, when he felt his knee "pop."  (R. 168).  Upon examination, no evidence was found of fracture, dislocation or effusion during the examination.  (Id).  Although the doctors found plaintiff's knee was tender at the left medial joint and ordered plaintiff to wear a knee brace, no medication was prescribed for the pain, no additional therapy was ordered, and plaintiff never sought any followup treatment for his condition.

Because plaintiff provided minimal medical evidence of the impairments and therefore failed to establish that his asthma, Hepatitis C, and leg pain had any impact on his daily activities or functioning, "there is no question but that [the ALJ] would have reached the same result not withstanding his initial error."  Harris v. Barnhart, 2003 WL 21744230 (W.D. Va. 2003) (unpublished).  Accord Ward v. Commissioner, 211 F.3d 652, 656 (1st Cir. 2000)("While an error of law by the ALJ may necessitate a remand, remand is not essential if it will amount to no more than an empty exercise.");  Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003)(refusing to remand case where "it is inconceivable that the ALJ would have reached a different conclusion on the record.").

However, as this case is being remanded on other grounds, the ALJ should explicitly address the issue on remand.

without regard to whether any such impairment, if considered
separately, would be of sufficient severity."  20 C.F.R. §
404.1523; Cook v. Heckler, 783 F.2d 1168, 1174 (4th Cir.1986)
(remanding due to ALJ's failure to evaluate claimant's mental
impairments in combination with her arthritis); Walker, 889 F.2d
at 49-50 (remanding due to ALJ's failure to "analyze the
cumulative effect the impairments had on the claimant's ability
to work").

     The ALJ ruled that "The claimant has been diagnosed with
hypochondriasis secondary to his ongoing somatic complaints of
physical health problems and fear of increased physical health
problems.  There is no evidence that the claimant actually has
any physical health problems that can be classified as severe or
as requiring work-related limitations."  (R. 25).

     Even if the plaintiff's physical health problems
individually do not require any work-related limitations, his
physical and mental injuries in combination may combine to form
additional work-related limitations.  Walker, 889 F.2d at 50 ("It
is axiomatic that disability may result from a number of
impairments which, taken separately, might not be disabling, but
whose total effect, taken together, is to render claimant unable
to engage in substantial gainful activity.").  As a result, on
remand, the ALJ should explicitly analyze the cumulative effect
the plaintiff's severe and non-severe impairments had on his
ability to work.[22]

5.   Conclusion

     For the reasons discussed above, the Court DENIES
defendant's motion and GRANTS plaintiff's motion to remand the
case to the Commissioner for further proceedings consistent with
this Memorandum.

     Despite the informal nature of this letter, it should be
flagged as an opinion and docketed as an Order.

                                   Sincerely yours,

_____

     [22] Like at Step Three, the ALJ's failure to consider the combined
effect of plaintiff's severe and non-severe impairments in combination
is likely harmless error, because plaintiff failed to produce any
medical evidence to suggest she even had the impairments, let alone
that the impairments affected her ability to do work.  However, as the
case is being remanded on other grounds, the ALJ should explicitly
address the issue on remand.

/s/

Susan K. Gauvey
United States Magistrate Judge